## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| FREEMAN D. BANKS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 04 C 3026 |
| v. | ) | Magistrate Judge Nan R. Nolan |
| | ) | |
| ARCHER/AMERICAN WIRE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Freeman Banks, an African-American man who is proceeding *pro se*, sued his current employer, Archer Wire International, Inc. ("Archer Wire"), for race discrimination, retaliation, and racial harassment under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Archer Wire moves for summary judgment. For the reasons that follow, the Court grants Archer Wire's summary judgment motion.

## BACKGROUND

### A. Northern District of Illinois Local Rule 56.1

Archer Wire objects to Banks' Response to Defendant's Statement of Undisputed Material Facts in its entirety on the grounds that it fails to comply with Local Rule 56.1. Local Rule 56.1 governs motions for summary judgment in this district. Banks is required to comply with Local Rule 56.1 despite his *pro se* status. Greer v. Bd. of Educ. of the City of Chicago, Illinois, 267 F.3d 723, 727 (7th Cir. 2001). Moreover, this Court is not required to search the record for a dispute of fact on behalf of a *pro se* party. Id. (stating "[e]mployment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are 'obligated in our adversary system to scour the record looking for factual disputes.'").

Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." Local Rule 56.1(b)(3)(A) requires the non-moving party to respond to "each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." The non-moving party is required "to admit or deny each factual statement proffered by the defendant and to designate with specificity and particularity those material facts believed to establish a genuine dispute for trial." Greer, 267 F.3d at 727. "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." L.R. 56.1(b)(3)(B). If the non-moving party wishes to present additional facts requiring the denial of summary judgment, it must do so in "a statement, consisting of short numbered paragraphs" supported by citations to the record. L.R. 56.1(b)(3)(B).

Because Banks is a *pro se* litigant, Archer Wire served him with a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment" as required by Local Rule 56.2 (the "Notice"). The Notice explained the purpose of summary judgment, Banks' obligations to respond to Archer Wire's motion, and the consequences of not doing so. Banks was also advised that he must comply with Local Rule 56.1 and provide a paragraph-by-paragraph response to Archer Wire's statement of facts. Despite receiving the Notice, Banks failed to comply with the requirements of Local Rule 56.1 in several critical respects. Along with its summary judgment motion, Archer Wire submitted 195 statements of facts. Banks failed to properly identify which facts he disputes. Banks' Response does not specifically admit or deny each of Archer Wire's statements of facts. Instead, Bank appears to have repeated Archer Wire's facts verbatim where there is no disagreement and, where Bank

2

disagreed, redrafted the particular statement of fact to reflect his version and/or improperly added new facts. Banks' new facts belong in a separate statement of additional facts pursuant to Local Rule 56.1(b)(3)(B). Banks also fails to cite to admissible evidence supporting his denials and additional facts. As a result, all of Archer Wire's facts that are supported by the record are deemed admitted. See L.R. 56.1(b)(3)(B); Smith v. Lamz, 321 F.3d 680, 683 (7th Cir. 2003) (stating "a mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material."); McGuire v. United Parcel Service, 152 F.3d 673, 675 (7th Cir.1998) (stating "[a]n answer that does not deny the allegations in the numbered paragraph with citations to supporting evidence in the record constitutes an admission."). The Court also disregards additional facts in Banks' Response because they were not included in a separate statement and did not include a specific reference to affidavits, or other supporting parts of the record. See L.R. 56.1(b)(3)(B).

Because Banks' Response is entirely non-compliant, the Court further disregards Banks' affidavit evidence and limits its analysis to the facts contained in Defendant's Statement of Undisputed Material Facts. Bordelon v. Chicago School Reform Board of Trustees, 233 F.3d 524, 529 (7th Cir. 2000) (holding district court properly refused to consider non-moving party's affidavits where non-moving party's response to moving party's statement of facts was "entirely non-compliant" with summary judgment local rule). Local Rule 56.1(b)(3)(B) makes clear "the consequence for noncompliance–the movant's assertions of material fact are deemed admitted–and this consequence applies regardless of what contrary evidence is in the record." Id; see also Koszola v. Bd. of Educ. of the City of Chicago, 385 F.3d 1104, 1107-09 (7th Cir. 2004).

Banks' failure to comply with Local Rule 56.1 does not result in the automatic grant of summary judgment. The Court must still determine whether Archer Wire is entitled to judgment as

3

a matter of law, viewing the facts in the light most favorable to Banks. Johnson v. Gudmundson, 35 F.3d 1104, 1112 (7th Cir. 1994) (stating "even where many or all of the material facts are undisputed, the court still must ascertain that judgment is proper 'as a matter of governing law.'").

## B.    Relevant Undisputed Facts[1]

### 1.    Banks' Employment

Banks was employed by Chicago Wirecraft Products, Inc. ("Wirecraft"), a wire fabrication business, from the late 1990s to July, 2002. DSUF 22. On or about July 15, 2002, Archer Wire purchased Wirecraft. DSUF 10. Archer Wire provides a diversified range of wire products, including barbeque grill grates, wire baskets for making French fries, and welded wire for sporting equipment, such as face guards for helmets. DSUF 4, 5. Archer Wire hired Banks on or about July 15, 2002, as a machine operator. DSUF 24. Banks is currently working for Archer Wire. DSUF 25. Throughout his employment with Archer Wire, Banks has worked as a machine operator mainly in the department that makes products for a large sporting equipment company. DSUF 26.

### 2.    Set-Up Employee versus Machine Operator

In addition to other employees involved in manufacturing operations, Archer Wire has "set-up" employees and machine operators. A set-up employee prepares a machine to produce a product, or a component of a product, in accordance with the product drawings, production plan, and the customer's specifications. DSUF 14. A machine operator assists the foreman or set-up employee in operating the machines, supplying the correct components or parts to the machine, and ensuring the parts being manufactured conform to the "first-piece" approved part. DSUF 15. The set-up position requires greater technical ability, knowledge, and training than the machine operator

---

[1] The following undisputed facts are taken from the Defendant's Statement of Undisputed Material Facts (DSUF) and accompanying exhibits.

4

position. DSUF 16. To move from a machine operator position to a set-up position, an employee must train on how to read the production plans, make the necessary calculations to set the controls, and perform other safety and quality assurance procedures. DSUF 17. Different machines involve different set up procedures and therefore require separate and different training. DSUF 18. In preparation for future possible need, Archer Wire trains employees to learn the set-up procedures even though there may not be a set-up position available. DSUF 21. Archer Wire does not have a separate "trainee" job classification or pay classification for employees that are training for a set-up position. DSUF 19. Trainees do not receive additional pay unless and until they are placed into a set-up position, if one becomes available. DSUF 20.

### 3. Spiral Machine Set-Up Position

In July 2002, Archer Wire hired former Wirecraft employee Michael Holmes, an African-American male, as a set-up employee on the spiral and "ring roller" machines. DSUF 28. Holmes is the only employee ever employed by Archer Wire who has set up spiral machines for Archer Wire. DSUF 29. Since July 2002, Archer Wire has not trained any employees to set up the spiral machines. DSUF 32. Since July 2002, Archer Wire has never had an open position for a set-up employee on the spiral machine. DSUF 33.

In February 2003, Banks told Conrad Martinez, Archer Wire's Production Manager, that he wanted to be the second shift set-up employee on the spiral machine claiming that he was already trained for the position. DSUF 8, 34. Martinez told Banks that there was not enough demand to support a set-up position on the spiral machine for the second shift. DSUF 35. Banks believed that there were not enough orders to support a set-up position on the second shift for the spiral machine. DSUF 36. No one at Archer Wire told Banks, or even hinted, that he would not be placed in the

5

spiral machine set-up position because he is African-American. DSUF 44.

Banks claims that Archer Wire trained Hong Cong Nguyen to set up the spiral machine for two to three weeks. DSUF 47. Nguyen operated the spiral machine during the second shift on a few occasions, but he did not set up the machine. DSUF 50. Nguyen was never trained to set up the spiral machine at Archer Wire and was never placed into the set-up position on the spiral machine at Archer Wire. DSUF 48, 49.

### 4.    Press Welder Set-Up Position

Anastacio Arceo was the set-up employee on the press welder at Wirecraft. DSUF 51. In July 2002, Archer Wire hired Arceo as the second shift set-up employee on the press welder in the metal face guard department. DSUF 52. In March 2003, Martinez offered to train Banks on how to set up the press welder in the metal face guard department, and Banks agreed. DSUF 53. Arceo trained Banks on how to set up the press welder machine for at least four months. DSUF 57, 59. Granados helped train Banks on how to set up the press welder machine. DSUF 62. Banks was trained on how to set up the press welder in the metal face guard department in case a position became available. DSUF 56.

Banks believes that Alejandro Sagal took his place on the press welder machine. DSUF 85. Segal assisted Arceo on the operation of the press welder in the metal face guard department for less than one month in late 2003 or early 2004. DSUF 86. Segal was never trained on how to set up the press welder machine, nor did Segal become a set-up employee on the press welder machine. DSUF 87. At no time since Banks began training on the press welder at Archer Wire has there been an open set-up position on the press welder in the metal face guard department. DSUF 54. Archer Wire has not placed any employee in the set-up position on the press welder in the metal face guard

6

department since Banks began training to set up the press welder. DSUF 55.

### 5.      Transfer to First Shift

In or around November 2003, Archer Wire received a large number of orders for metal face guards. DSUF 72. Archer Wire moved approximately seven employees, including Banks, from the second shift to the first shift to have employees with experience in the metal face guard department on the first shift to accommodate the new orders. DSUF 73. Banks prefers to work the second shift. DSUF 78. Martinez told Banks that Banks was being moved to the first shift because Archer Wire needed more people on the first shift. DSUF 74. Banks does not believe that he was placed on the first shift because of his race or color. DSUF 76.

In November 2003, Banks complained to his union because he believed that non-African American employees with less seniority than him stayed on the second shift. DSUF 79; Pl's Dep. at 110.[2] The union and Archer Wire held a grievance meeting concerning Banks' complaint. DSUF 80. As a result of the grievance meeting, Archer Wire agreed to move Banks back to the second shift. DSUF 81. Banks was on the first shift for no more than a week. DSUF 82. Banks did not receive less in pay or benefits while working on the first shift. DSUF 83. After Banks returned to the second shift, he did not ask to be put in any other set-up position or to be trained for any other set-up position. DSUF 84.

---

[2] A factual dispute exists regarding whether Banks complained of race discrimination during the November 2003 grievance meeting. Svabek's states that Banks did not raise the issue of racial discrimination at any time during the grievance meeting. DSUF 191; Svabek's Aff. ¶ 43. Banks' states that he told Svabek about "discrimination in the company" at the November 2003 grievance meeting. DSUF 190; Pl's Aff. ¶¶58-59.

## 6. Written Warnings

In 2004, Banks received three written "employee warning reports." On January 20, 2004, Banks received a written warning from Crisantos Granados for failing to meet the standard number of pieces per hour. DSUF 109. On May 4, 2005, Banks received another written warning for failing to meet the production standard and for producing bad parts. DSUF 112. On September 24, 2004, Banks received a written warning for excessive unexcused absences, which resulted in a two-day suspension for his third warning in one year, pursuant to Archer Wire's work rules. DSUF 123, 125, 128. Banks admits that he engaged in the conduct for which he received each written warning. DSUF 111, 113, 124. Many non-African American employees who never filed a charge of discrimination received written warnings for the same conduct from the same management team during the same time period. DSUF 134-189.

## 7. Alleged Harassment

Banks claims that Martinez, Granados (the second shift Production Manager), and Arceo began harassing him after he filed the union grievance in November 2003. DSUF 88, 93. The alleged harassment also began after Banks' training on the press welder machine ended. DSUF 94. No one at Archer Wire has made any comments to Banks regarding his race or his color. DSUF 89. Prior to the time Banks filed a union grievance in November 2003, Banks did not have any problems with Martinez. DSUF 95. Banks testified that "Martinez hasn't really been harassing [him]." DSUF 96. Banks claims that there were "a couple of small incidents" where Martinez timed his performance after Banks filed the union grievance. DSUF 97. Other than the timing incidents, Banks does not claim that there was any other alleged harassment by Martinez. DSUF 98. Martinez times the performance of many employees, including Banks, in order to develop the proper standard

8

rates Archer Wire should expect from production machines and employees. DSUF 99.

Banks claims that Arceo discriminated against him by closely scrutinizing Banks' work. DSUF 101. Banks claimed that Arceo would do "little simple things" to harass him, such as not allowing Banks to sit down or use a radio. DSUF 102. Arceo never made any statements about Banks that referred to Banks' race or color. DSUF 91. Banks claims that Granados harassed him in the same manner as Arceo, but on a less frequent basis. DSUF 103. Banks also claims that Granados harassed him by giving him "bogus write-up" and closely scrutinized Banks' work. DSUF. 104. Banks further claims that Granados retaliated against him for filing the instant lawsuit against Archer Wire. DSUF 105.

## DISCUSSION

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." Id. at 256.

Banks alleges that Archer Wire discriminated against him in violation of Title VII and 42 U.S.C. § 1981. Banks claims that he was demoted from a set-up position, denied a promotion to two

9

set-up positions, transferred to first shift, and given three written warnings because of his race.[3] Banks also alleges that he was subjected to a racially hostile work environment and retaliated against for complaining about discrimination.

Title VII prohibits workplace discrimination "with respect to [the employee's] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1981 provides that "[a]ll persons ... shall have the same right ... to make and enforce contracts, ... as is enjoyed by white citizens. . . . " 42 U.S.C. 1981(a). An employer may not retaliate against an employee who has complained about discrimination. 42 U.S.C. § 2000e-3(a). An employee may also establish a violation of either statute by proving that he was subjected to a hostile work environment. Hrobowski v. Worthington, 358 F.3d 473, 476 (7th Cir. 2004). Claims brought under § 1981 are analyzed under the same framework as claims brought under Title VII. Williams v. Waste Management of Ill., Inc., 361 F.3d 1021, 1028 (7th Cir. 2004). The Court addresses each of Banks' claims in turn.

## A.     Scope of the Charge

Archer Wire first argues that any allegation that Banks received employee warning reports in January, May, and September 2004 because of his race or in retaliation for filing a charge is beyond the scope of his EEOC complaint and should not be considered by the Court. "[A] Title VII plaintiff may bring only those claims that were included in her EEOC charge, or that are like or reasonably related to the allegations of the charge and growing out of such allegations." Haugerud

---

[3] Archer Wire argues in its Reply that Banks has failed to establish a claim that he was never evaluated as a trainee in the set-up position on the press welder position because of his race. The Court need not address this issue because Banks' Memorandum does not argue that he failed to receive an evaluation because of his race.

10

v. Amery Sch. Dist., 259 F.3d 678, 689 (7th Cir. 2001). "[T]he EEOC charge and the complaint must, at a minimum, describe the same conduct and implicate the same individuals." Id. "Nevertheless, because most EEOC charges are completed by laypersons rather than by lawyers, a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint." Cheek v. Western and Southern Life Ins. Co., 31 F.3d 497, 500 (7th Cir. 1994).

Because they post-date his January 16, 2004 EEOC charge, Banks did not allege in his charge that the warnings were based on his race or were retaliatory. The allegations regarding the written warnings may thus be considered only if they are reasonably related to the charge filed. In his deposition, Banks testified that he believed Granados gave him "bogus" written warnings in retaliation for filing this lawsuit and as part of the alleged racial harassment. Banks' Dep. at 138. Banks' current allegations regarding the written warnings involve a similar time period, similar persons and similar conduct as that asserted in his EEOC charge. First, the allegations contained in the charge and the allegations regarding the written warnings involve the same time period. The charge states that the discrimination took place beginning on July 1, 2003 and the latest date of discrimination occurred on January 16, 2004, the date the charge was filed. Banks also indicated that the discrimination was "continuing." The written warnings occurred shortly thereafter in January, May, and September 2004.

Second, there is a factual relationship between Banks' allegations regarding the warnings and the allegations in the charge. In his charge, Banks complained, among other things, that after he filed a grievance alleging race discrimination in November 2003, his work product was more closely scrutinized. Banks also contended that Black employees were "more closely monitored throughout

the shift than non-Blacks." The alleged close scrutiny and monitoring of Bank's work product may be related to two of the written warnings. The January 2004 warning concerned Banks' failure to make the standard number of pieces per hour. DSUF 109. The May 2004 warning involved Banks' failure to properly trim 65 pieces and failure to meet the standard rate per hour. DSUF 112. It can reasonably be argued that the "over-scrutiny" of Banks' work may have resulted in these two written warnings. The Court finds that Banks' current allegations regarding the warnings are reasonably connected to the allegation of over-scrutinizing his work, which was raised in his charge.

Banks received the September 2004 warning for missing nine (9) days of work over a three-month period. DSUF 123. Although the charge makes no mention of conduct related to the September 2004 warning, that event occurred shortly after the first two written warnings and was issued by same person who issued the first two warnings, Granados. One would therefore reasonably expect Banks' claims regarding the September 2004 to be discovered during the course of an EEOC investigation into the allegations in the charge. Cheeks, 31 F.3d at 500.

Third, the allegations in the charge and the allegations regarding the written warnings implicate the same person. Granados issued the three written warnings. DSUF 109, 112, 123. Banks claims that Granados as well as Martinez and Arceo racially harassed him and retaliated against him. DSUF 88, 93, 101, 103, 104, 105.[4] For these reasons, the Court concludes that there is a reasonable relationship between the allegations in the charge and Banks' claims of race discrimination and retaliation regarding the written warnings.

---

[4] Archer Wire does not contend that the charge of discrimination was inadequate to satisfy the exhaustion requirement as to Banks' claim of racial harassment.

12

**B.     Race Discrimination**

**1.     Demotion Claim**

Archer Wire claims that Banks' demotion claim is time-barred because it occurred more than 300 days before the charge was brought. "Title VII provides that a charge of racially discriminatory employment practices shall be filed with the EEOC within 300 days 'after the alleged unlawful employment practice occurred.'" Beamon v. Marshall & Ilsley Trust Co., 411 F.3d 854, 860 (7th Cir. 2005). "Failure to file a timely charge with the EEOC precludes a subsequent lawsuit under Title VII." Id. Banks filed his EEOC charge on January 16, 2004. Banks' claims have to be based on conduct that occurred after March 22, 2003. Banks claims that he was removed from a spiral machine set-up position in October of 2002. See Pl's Charge of Discrimination. Banks' demotion claim is time-barred.

Even if the demotion claim was not time-barred, Banks can not succeed on the merits. A Title VII plaintiff can prove discrimination using either the direct method or indirect method set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). "[D]irect evidence 'essentially requires an admission by the decision-maker that his actions were based on the prohibited animus.'" Rhodes v. Ill. Dep't of Transp., 359 F.3d 498, 504 (7th Cir. 2004). "A plaintiff can also prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decisionmaker.'" Id. (quoting Troupe v. May Dept. Stores Co., 20 F.3d 734, 737 (7th Cir. 1994)).

Banks claims that in October 2002, he was demoted from his position as spiral machine set-up employee to a production worker because of his race. Banks has no direct evidence of discrimination. He admits that no Archer Wire employee ever made comments to him about his race

or color. DSUF 89, 90. Banks further admitted in his deposition that he suffered no discrimination prior to early 2003. Pl's Dep. at 134. It is also undisputed that there were not enough orders to support a second shift spiral machine set-up employee in October and November 2002. Pl's Dep. at 85-86. Banks admits that no one told him, or even hinted, that he would not be placed in the spiral machine set-up position because he is African-American. DSUF 44. After Banks started working at Archer Wire, no one told Banks that he would be working as a set-up employee on the spiral machine. DSUF 45. Banks testified that Martinez told him in early 2003 that Banks was not being placed in the set-up position for the spiral machine because "we just don't like you." DSUF 42. Martinez denies making such a statement, but even if he did, such a statement is racially neutral on its face and does not raise an inference of discrimination. DSUF 42.

Because there is no direct evidence of race discrimination, the Court analyzes Banks' demotion allegation under the indirect method of proof. To establish a claim of discrimination in the context of a demotion, Banks must show four elements: (1) he was a member of a protected class; (2) he was meeting his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees not in the protected class were treated more favorably. Simmons v. Chicago Bd. of Ed., 289 F.3d 488, 492 (7th Cir. 2002). If he meets this burden, Archer Wire must provide a legitimate, nondiscriminatory reason for his demotion. Id. The burden then returns to Banks to present evidence that the reasons offered by Archer Wire are a pretext for discrimination. Id.

Under this claim, Banks must show that Archer Wire demoted him. Banks cannot satisfy the third element of the prima facie case because the undisputed facts establish that he did not suffer a demotion. Banks argues that Archer Wire discriminated against him because of his race by demoting

14

him from set-up employee to production worker in October 2002. Archer Wire hired Banks on or about July, 2002 as a machine operator. DSUF 24. Throughout his employment with Archer Wire, Banks has worked as a machine operator. DSUF 26. Since July 2002, Archer Wire has never had an open position for a set-up employee on the spiral machine. DSUF 33. Because Banks has failed to establish a required element of his prima facie case of race discrimination, further analysis under McDonnell Douglas is unnecessary. Pasqua v. Metropolitan Life Ins. Co., 101 F.3d 514, 519 (7th Cir. 1996).[5]

### 2. Failure to Promote Claim

Banks' failure to promote claim fares no better. Banks appears to contend that he was not promoted to a set-up position on the spiral machine or the press welder machine because of his race. Archer Wire argues that Banks' failure to promote to the spiral machine set-up position claim is time-barred. Banks filed his charge on January 16, 2004, which means that any claim arising more than 300 days prior, or before March 23, 2003, is time-barred. Banks has admitted that the alleged failure to promote to the spiral machine set-up position occurred in February 2003. See Banks' Response to DSUF 32-34 and 47. Banks' failure to promote to the spiral machine set-up claim is therefore time-barred.

Even if his claim was not time-barred, it fails on the merits. Banks has submitted no direct evidence of discrimination. Lacking any direct evidence of racial animus, Bank must rely on the indirect method of proving racial discrimination. In order to establish a prima facie case of race

---

[5] Banks' failure to present evidence under either the direct or indirect method establishing that he was demoted from a set-up position because of his race renders this evidence irrelevant as background evidence for Banks' timely claims. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (holding time-barred acts may be considered as background evidence for a plaintiff's timely claims).

discrimination for failure to promote, Banks must show that (1) he is a member of a protected class, (2) he applied and is qualified for an open position, (3) he was rejected for the position, and (4) the employer awarded the position to someone outside the protected class who was similarly or less qualified than Banks. Jordan v. City of Gary, Indiana, 396 F.3d 825, 833 (7th Cir. 2005). As the Court is limited to the contents of Defendant's Statement of Undisputed Material Facts, the undisputed evidence establishes that Banks cannot satisfy the last three elements of the prima facie case.

There is no dispute that Archer Wire has not had an open set-up position on the spiral machine since July 2002. DSUF 33; see Howard v. Lear Corp. Eeds and Interiors, 234 F.3d 1002, 1006 (7th Cir. 2000). Moreover, Michael Holmes, an African-American, is the set-up employee for the spiral machine and has been since July 2002. DSUF 28. Holmes is the only employee ever employed by Archer Wire who has set up the spiral machines for Archer Wire. DSUF 29. Although Banks claims that Archer Wire trained Hong Cong Nguyen to set up the spiral machine for two or three weeks, the undisputed facts establish that Nguyen was never trained to set up the spiral machine at Archer Wire nor placed into the set-up position on the spiral machine at Archer Wire. DSUF 47-49. On a few occasions, Nguyen operated the spiral machine during the second shift but did not set up the machine. DSUF 50. Given the undisputed difference between "operating" and "setting up" a machine (DSUF 14-18), the fact that Nguyen operated the spiral machine for a few weeks does not support an inference that there was a vacant set-up position on the spiral machine.

Moreover, even if a set-up position on the spiral machine was available, Banks has not shown that he was qualified for the position. In or around February of 2003, Banks told Martinez he wanted to set up the spiral machine on second shift. DSUF 34. Banks' former supervisor from Wirecraft,

16

Michael Holmes, testified that Banks alternated between a trainee and an operator at Wirecraft. DSUF 37. Holmes told Martinez that Banks did not have a good working knowledge of how to operate or set-up the spiral machine and that Banks had produced bad parts on the spiral machine at Wirecraft. DSUF 39. Holmes also told Martinez that he (Holmes) did not want to be responsible for parts produced by Banks on the spiral machine. DSUF 40. On the current record, Banks has not shown that he was qualified for a set-up position on the spiral machine.

Similar facts apply to the press welder set-up position. There was no available press welder set-up position. Arceo was the set-up employee on the press welder at Wirecraft. DSUF 51. In July 2002, Archer Wire hired Arceo as the second shift set-up employee on the press welder in the metal face guard department. DSUF 52. In or around March 2003, Martinez offered Banks the opportunity to train on how to set up the press welder in the metal face guard department and Banks agreed. DSUF 53. In order to be prepared for future anticipated need, Archer Wire trains employees to learn set-up procedures even through there may not be a set-up position available at the time. DSUF 21. Arceo trained Banks for at least four months in set-up procedures on the press welder in case a position became available in the future. DSUF 56, 59, 60. Banks has no complaints about the way Arceo trained him to set up the press welder machine. DSUF 61. Being trained does not guarantee a promotion to a set-up position. DSUF 19-21. At no time since Banks began training on the press welder at Archer Wire has there been an open set-up position on the press welder in the metal face guard department nor has anyone been promoted to such position. DSUF 54, 55.[6]

---

[6] There is also no evidence in the record indicating that Banks' training on the press welder set-up position ended because of his race. It is undisputed that from July to October 2003, the orders for the metal face guard department decreased significantly from what Archer Wire had projected, which resulted in fewer set-ups to perform on the press welder machine. DSUF 63, 64. As a result, Banks' duties shifted back to production. DSUF 65. At the same time, many set-up employees, not just trainees, were required to perform production duties due to the lack of set-ups to perform.

Banks claims that a non-African American (Alejandro Sagal) was promoted to the set-up position instead of him. DSUF 85. The undisputed facts demonstrate otherwise. Sagal assisted Arceo on the operation of the press welder in the metal face guard department for less than one month in late 2003 or early 2004. DSUF 86. Sagal was never trained on how to set up the press welder machine, nor did Sagal become a set-up employee on the press welder machine. DSUF 87. No one outside Banks' protected class, or anyone else, was promoted into the press welder set up position trained for by Banks. DSUF 55. Even if a press welder set-up position was available, Banks has not shown that he was qualified for the position. Granados and Arceo both testified that Banks was not fully trained or prepared to fill the position. DSUF 68, 70, 71.

Even assuming Banks could demonstrate a prima facie case on his failure to promote claim, Banks has not shown that Archer Wire's reasons for failing to place him in a set-up position on the spiral machine or press welder was a pretext for unlawful discrimination. Archer Wire has produced evidence of a legitimate, nondiscriminatory reason for not placing Banks in the set-up positions: no positions were available and he was not qualified. To demonstrate pretext, "a plaintiff must show more than that the employer's decision was incorrect, the plaintiff must also show the employer lied about its proffered explanation." Abioye v. Sundstrand Corp., 164 F.3d 364, 368 (7th Cir. 1998).

Archer Wire purchased spiral machines mainly to service a former Wirecraft customer that ordered wire fan guards. DSUF 27. In July 2002, Archer Wire hired Holmes, an African-American from Wirecraft, as a set-up employee for the spiral machine. DSUF 28. In early 2003, that customer ceased purchasing the wire fan guards from Archer Wire. DSUF 30. After the orders from the fan guard company ceased, Archer Wire rarely used the spiral machines and only for a small number of

---

DSUF 66.

low volume clients. DSUF 31. There was not enough customer demand to support a set-up position on the spiral machine for the second shift. DSUF 35. Banks does not disagree; it is undisputed that Banks believed that there were not enough orders to support a set-up position on the second shift for the spiral machine. DSUF 36. Moreover, Holmes, who is familiar with Banks' operation and set-up of the spiral machine at Wirecraft, warned against placing Banks on the spiral machine. DSUF 38-40. With respect to the press welder set-up position, it is undisputed that an open position never existed on the second shift. DSUF 54, 55. In addition, Granados and Arceo believed that Banks was not qualified to perform set-up on the press welder without further training. DSUF 68-70. On the current record, there is no evidence suggesting that the real reason Archer Wire failed to promote Banks to the set-up positions was related to his race.

### 3. Transfer to First Shift

Banks alleges that he was transferred from second shift to first shift in November 2003 because of his race. Banks has no direct evidence of discrimination. DSUF 89, 90. Banks does not believe that he was moved to the first shift because of his race or color. DSUF 76, 77. To establish a prima facie case of discrimination with respect to his transfer, Banks must show that (1) he is a member of a protected class, (2) he performed his job satisfactorily, (3) he suffered an adverse employment action, and (4) the employer treated similarly situated employees who are not in the protected class more favorably. Grube v. Lau Indus., Inc., 257 F.3d 723, 728 (7th Cir. 2001). Banks did not suffer an adverse employment action. A transfer to a different shift, without any reduction of status or pay or significantly diminished job responsibilities, is not an adverse employment action. Grube, 257 F.3d at 728; see also Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 275 (7th Cir. 1996) (holding "a transfer involving no reduction in pay and no more than a minor change in

working conditions" does not constitute an adverse employment action). It is undisputed that Banks was on the first shift for no more than one week, and he did not receive less in pay or benefits while working on the first shift. DSUF 82, 83. Working the second shift is Banks' personal preference, but "not everything that makes an employee unhappy is an actionable adverse action." Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996).

Moreover, even if Banks could make out a prima facie case of discrimination with respect to his transfer to the first shift, Banks cannot avoid summary judgment because there is no evidence of pretext to rebut Archer Wire's non-discriminatory reason for his transfer. According to Archer Wire, Banks was assigned to first shift because of a large influx of orders for metal face guards in or around November 2003. DSUF 72. Archer Wire moved approximately seven employees, including Banks, from the second shift to the first shift to have experienced employees on the first shift to accommodate these new orders. DSUF 73. Martinez told Banks that he was being moved to the first shift because they needed more people on the first shift. DSUF 74. Banks does not doubt Archer Wire's explanation that it needed more employees to work the first shift. DSUF 75. Although Banks now claims that less senior, non-African American employees (Nuygen and Que Nuygen) did not have to transfer to first shift, Banks admitted at his deposition that he did not think his transfer was because of his race or color. DSUF 76.

### 4. Written Warnings

Banks also alleges that he was unlawfully discriminated against when Granados issued him written warnings on three occasions for: (1) failing to make the standard number of pieces per hour in January 2004; (2) failing to properly trim 65 pieces and failing to meet the standard rate per hour in May 2004; and (3) missing nine days of work over a three-month period in September 2004.

20

Banks has no direct evidence of discrimination. DSUF 89, 90. Granados never told Banks that he does not like Banks because Banks is African-American or that Granados does not like African-Americans in general. DSUF 92. In order for Banks to show that he was disciplined for a prohibited discriminatory reason, he must establish that: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate work expectations; (3) he suffered an adverse employment action; and (4) similarly situated non-African American employees were treated more favorably. Jordan, 396 F.3d at 835. Banks cannot establish a prima facie case.

Archer Wire claims that Banks' performance was not meeting its expectations because Banks admitted engaging in the conduct that resulted in the three written warnings in 2004. The fact that Banks was not meeting his employer's legitimate expectations is not dispositive here. Where a plaintiff alleges discriminatory discipline based on disparate punishment "the second and fourth prongs of McDonnell Douglas merge." Lucas v. Chicago Transit Authority, 367 F.3d 714, 728 (7th Cir. 2004). In these cases, "there is no question that the employee failed to meet his employer's expectations. Instead, the plaintiff must establish that he received dissimilar–and more harsh–punishment than that received by a similarly situated employee who was outside the protected class." Id. Accordingly, it is unnecessary to consider whether Banks was meeting Archer Wire's legitimate expectations, and the Court focuses on Archer Wire's challenge to the third and fourth elements of the prima facie case.

Archer Wire argues that the January and May 2004 written warnings did not amount to an adverse employment action because there was no corresponding loss of pay or benefits. An adverse employment action is a "quantitative or qualitative change in the terms or conditions of employment." Haywood v. Lucent Techs., Inc., 323 F.3d 524, 532 (7th Cir. 2003). "[A] negative

21

evaluation or admonishment by an employer does not rise to the level of an adverse employment act. There must be some tangible job consequence accompanying the reprimand to rise to the level of a material adverse employment action; otherwise every reprimand or attempt to counsel an employee could form the basis of a federal suit." Lucas, 367 F.3d at 731 (internal citations omitted); See also Sweeney v. West, 149 F.3d 550, 556-57 (7th Cir. 1998); Smart, 89 F.3d at 442 (holding undeserved negative performance evaluations alone cannot constitute an adverse employment action).

Banks argues that the written warnings qualify as adverse actions because they affect his eligibility for future promotions. Pl's Opp. at 3. Archer Wire's Employee Handbook states: "An excessive number of warnings could not only hamper advancement but also result in a period of probation, suspension without pay, or eventual dismissal." Def's Exh.C-2 at 12. The Court concludes that on the current record, the January and May 2004 written warnings do not amount to a materially adverse employment action. It is undisputed that the two warnings did not result in any tangible job consequence. Banks has not been placed on probation, suspended, or dismissed. See Kersting v. Wal-Mart Stores, Inc., 250 F.3d 1109, 1118-19 (7th Cir. 2001). Although with the benefit of hindsight, each warning brought Banks closer to his September 2004 suspension, "[s]uch a course was not an inevitable consequence of every reprimand." Oest v. Illinois Dep't. of Corrections, 240 F.3d 605, 613 (7th Cir. 2001). "[J]ob-related criticism can prompt an employee to improve her performance and thus lead to a new and more constructive employment relationship." Id.

Banks must point "to an immediate consequence of the reprimands, such as ineligibility for job benefits like promotion, transfer to a favorable location, or an advantageous increase in responsibilities" to show that disciplinary actions amount to an adverse employment action. Oest, 240 F.3d at 613. There was no immediate consequence of the first two written warnings. Banks is

22

not ineligible for promotion. The fact that the two written warnings could lead to more severe future discipline under Archer Wire's progressive discipline system or affect a future promotion seems too speculative to constitute an adverse employment action. See Thomsen v. Romeis, 198 F.3d 1022, 1028 (7th Cir. 2000) (abrogated on different grounds by Spiegla v. Hull, 371 F.3d 928 (7th Cir. 2004)) (cited in Oest for the proposition that "the reprimands the plaintiff had received might not, as the plaintiff asserted, lead to future discipline and affect his ability to compete for promotions and concluding that "[t]hese consequences, considered either individually or in conjunction with each other, appear to be somewhat speculative.").

Even if the Court is wrong about whether the January and May 2004 written warnings are materially adverse, Archer Wire is entitled to summary judgment on this claim. Regarding the fourth prong of the prima facie case, it is undisputed that similarly situated non-African American employees were not treated more favorably. DSUF 134-189. Similarly situated employees are "directly comparable to [the plaintiff] in all material respects." Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002). To determine whether two employees are directly comparable, the Court considers whether the employees held the same job description, were subject to the same standards, and were subordinate to the same supervisor. Brummett v. Sinclair Broadcast Group, 2005 WL 1567297, at *6 (7th Cir. July 6, 2005). Archer Wire presented a list of non-African American employees who received written warnings for the same conduct as Banks. DSUF 134-189. The other employees are similarly situated to Banks because they are production employees under the same management team, and were subject to the same performance standards.

For similar reasons, Banks has not presented sufficient evidence of pretext to preclude summary judgment. Archer Wire's non-discriminatory reason for the written warnings is that it was

applying its work rules regarding poor work quality, production goals, and unexcused absences. As discussed above, there is no evidence showing that similarly situated employees belonging to a different racial group received more favorable treatment. Thus, there is no genuine issues as to whether Archer Wire's reason for disciplining Banks was a pretext for discrimination.

## C.    Retaliation

The Court next considers Banks' retaliation claim. Banks seems to claim that Archer Wire retaliated against him by issuing him the three written warnings in 2004, after he filed his EEOC charge. Under the direct method, a plaintiff must present direct evidence of (1) a statutorily protected activity, (2) an adverse employment action and (3) a causal connection between the two. Davis v. Con-Way Transportation Central Express, Inc., 368 F.3d 776, 786 (7th Cir. 2004). "'Direct evidence' is defined the same for discrimination and retaliation claims–that is, it can be an admission of intentional discrimination or a 'mosaic' of circumstantial evidence that directly points to a discriminatory intent." Id. There is no direct evidence of retaliation. The only possible circumstantial evidence to which Banks could point would be suspicious timing because Banks received his first written warning in the same month he filed his EEOC charge. Given Banks' admission that he engaged in the conduct that resulted in the January 2004 warning, a reasonable jury could not conclude from timing alone that Banks' first written warning was retaliatory.[7]

Because Banks does not have any direct evidence that the three written warnings were retaliatory, he must proceed under the indirect burden-shifting analysis. Under the indirect method, Banks must establish a prima facie case of retaliation by showing that: (1) he engaged in a statutorily

---

[7] Moreover, Banks admitted that he did not tell Granados that he filed a charge of discrimination with the EEOC, and there is no evidence in the record that Granados was aware of that fact when he issued Banks the first written warning. DSUF 193

protected activity; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in a statutorily protected activity. Archer Wire does not dispute that Banks engaged in protected activity but argues that Banks cannot show a genuine issue of material fact regarding the other three elements. Filing the EEOC charge and the union grievance regarding alleged race discrimination in Bank's transfer to first shift are statutorily protected activity. Lang v. Illinois Dept. of Children and Family Services, 361 F.3d 416, 419 (7th Cir. 2004). The analysis of the second, third, and fourth elements of his retaliation claim is the same as his discrimination claim regarding the written warnings. The January and May 2004 warnings were not adverse employment actions.[8] In addition, Banks' failure to demonstrate that Archer Wire treated more favorably similarly situated employees who did not engage in protected activity dooms his retaliation claim. DSUF 134-189.

**D.    Hostile Work Environment**

Banks also alleges that he was subjected to a racially hostile work environment. To establish a claim of racial harassment, Banks must show that (1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was sufficiently severe or pervasive so as to alter the conditions of his employment and create a hostile or abusive atmosphere and (4) there is a basis for employer liability. Luckie v. Ameritech Corp., 389 F.3d 708, 713 (7th Cir. 2004). A hostile work environment must be both objectively and subjectively offensive. Id. at 714. Since

---

[8] Retaliatory harassment can establish an adverse employment action if "it is severe enough to cause a significant change in the plaintiff's employment status." Stutler v. Ill. Dep't of Corr., 263 F.3d 698, 703 (7th Cir.2001). It appears that the same conduct Banks claims is retaliatory is the same conduct that Banks claims as racial harassment. DSUF 104, 105. Banks' claims that his work was overly scrutinized, that he was not allowed to sit down or use a radio, and that he was given "bogus write-ups" did not alter his compensation, benefits, or job responsibilities. Nor did they materially alter the conditions of his work environment or employment status in a significantly negative way. Banks' complaints of harassment do not amount to an adverse employment action.

Banks fails to establish at least two of the elements of a hostile work environment claim, Archer Wire is entitled to summary judgment.

To satisfy the second element of his hostile work environment claim, Banks must show that the conduct at issue had a racial character or purpose. Luckie, 389 F.3d at 713. "[N]ot every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority." Beamon, 411 F.3d at 863. Rather, "the alleged harassment must be 'sufficiently connected to race' before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race." Id. at 864.

Banks has failed to show that the complained-of actions were attributable to race. Banks claims that he was harassed by Martinez, Granados, and Arceo after he filed the union grievance in November, 2003. DSUF 88, 93. Banks claims that there were "a couple of small incidents" where Martinez timed Banks' work performance. DSUF 97. Banks also testified that "Martinez hasn't really been harassing me." DSUF 96. Other than the timing incident, there are no other instances where Martinez allegedly harassed Banks. DSUF 98. Banks claims that Granados and Arceo harassed him by closely scrutinizing Banks' work. DSUF 101, 103, 104. Banks testified that Arceo would do "little simple things" to harass him, such as not allowing Banks to sit down or to use the radio. DSUF 102. Banks claims that Granados harassed him by giving Banks "bogus write-ups." DSUF 104.[9]

None of these incidents has a racial character or purpose. Banks was not the target of any racial slurs, epithets, or other overtly race-related behavior. DSUF 89-92. Moreover, "[t]here is no

---

[9] Banks' claims in his Opposition that he has been "barraged by blaring unfamiliar music" and has had "fire spewed on him by a press welder" is not supported by the current record. Pl's Opp. at 2.

inherently racial component to an employer providing an employee with a critical (even an unfairly critical) performance review . . . ." Beamon, 411 F.3d at 864. Banks has not shown any connection between the "harassment" of which he complains and his race. To the extent that the "over-scrutiny" of his work resulted in written warnings, Granados, Martinez, and other managers have issued written warnings to non-African American employees for the same conduct during the same time period. DSUF 134-189. Banks witnessed Granados discipline a non-African-American employee under for failing to meeting production goals on a new machine, which the same conduct which gave rise to Banks' May 2004 written warning. DSUF 112-121. Banks also admitted engaging in the conduct for which he received the written warnings, which shows that the warnings were not "bogus." DSUF 111, 113, 124.

Furthermore, the incidents at issue, even when taken together, are not sufficiently severe or pervasive to amount to an objectively hostile work environment. To determine whether an environment is objectively hostile or offensive, the court must consider all the circumstances, including frequency and severity of the conduct, whether it is humiliating or physically threatening, and whether it unreasonably interferes with an employee's work performance. Luckie, 389 F.3d at 714. "The workplace that is actionable is the one that is hellish." Rogers v. City of Chicago, 320 F.3d 748, 752 (7th Cir. 2003) (quoting Baskerville v. Culligan Int'l Co., 50 F.3d 428 (7th Cir. 1994)).

Banks has not shown that his workplace was hellish. Compare with Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668 (7th Cir. 1993); Daniels v. Essex Group, Inc., 937 F.3d 1264 (7th Cir. 1991). Viewing the evidence in a light most favorable to Banks, the record reveals that Banks' work performance was timed, Banks' work was "over-scrutinized," Banks received three written warnings, and Banks was not allowed to sit down or listen to a radio at work. These are isolated

incidents that were not physically threatening or humiliating. Moreover, Martinez times the performance of other employees. Banks also engaged in the conduct for which he was disciplined, and it is undisputed that Banks and his co-workers received written warnings for the same conduct. No reasonable jury could find that the work environment described by Banks was objectively hostile. See Herron v. DaimlerChrysler Corp., 388 F.3d 293 (7th Cir. 2004) (plaintiff's complaints about transfers, a late overtime payment, his salary, and difficulties with his managers was "normal workplace friction" and neither severe nor pervasive enough to constitute racial harassment); Patton v. Indianapolis Pub. Sch. Bd., 276 F.3d 334, 339 (7th Cir.2002) (rejecting hostile work environment claim even though plaintiff's supervisors treated her rudely, ignored her suggestions, failed to communicate changes at work, and severely criticized her because "a reasonable jury could not have determined [this] treatment to be so severe or pervasive as to alter the conditions of [plaintiff's] employment in a significant way."). Since Banks did not show a connection to his race or the existence of a hostile work environment, the Court need not examine the issue of employer liability.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment [20-1, 21-1] is granted. The Clerk is directed to enter judgment in favor of Defendant and against Plaintiff on the complaint pursuant to Federal Rule of Civil Procedure 58. This case is set for a status hearing on September 1, 2005 at 9 a.m.

ENTER:

*Nan R. Nolan*

Nan R. Nolan
United States Magistrate Judge

Dated: August 17, 2005